SOUTHERN SAND & MATERIAL COMPANY *v.* PEOPLE'S SAV-

INGS BANK & TRUST COMPANY.

Opinion delivered November 27, 1911.

1. BILLS AND NOTES—EFFECT OF TRANSFER TO BANK.—When a check is taken to a bank, and the bank receives it and places the amount to the credit of the customer, the title to the check is vested in the bank. (Page 279.)

2. SAME—INNOCENT PURCHASER.—One who takes negotiable paper in payment of an antecedent debt before maturity and without notice of any defect therein receives it in the due course of business and is a holder for value.   (Page 279.)

3. SAME—EFFECT OF ATTACHING MEMORANDUM TO CHECK.—Where the maker of a check pinned to it a memorandum to the effect that it was signed under protest, but such memorandum was detached before the check was transferred to an innocent purchaser, the latter will be protected.   (Page 281.)

Appeal from Pulaski Circuit Court, Second Division: *F. Guy Fulk,* Judge; affirmed.

STATEMENT BY THE COURT.

Plaintiff (appellee) brought suit against the defendant, alleging it was indebted to it in the sum of $530.21, with interest upon a check, as follows:

"Helena, Ark., July 13, 1910. No. 2.
"The Southern Trust Company, of Little Rock, Ark.
"Pay to Helena Ship Yard and D. D. Co. or bearer ($530.21)
five hundred and thirty and 21-100 dollars.
"Sou. Sand & Matl. Co.
"By Mord Roberts, Prest."
(Indorsed on reverse side) "Helena Ship Yd. & D. D. Co."

That the check was transferred by the indorser, Helena
Ship Yard & Dry Dock Company, to the plaintiff for value and
without notice, and on July 14, 1910, presented to the drawee
and to the defendant, and payment was demanded and refused.

The defendant answered, denying any indebtedness, that
it drew the check, as alleged, that same was transferred for
value and without notice to the plaintiff, that said check was
presented to the drawee, or that same was the property of plain-
tiff; admitted that it delivered said check to the dry dock com-
pany as alleged, but that it was cancelled and of no effect before
delivered, for "that attached to and made a part of said check
was a statement that it was executed under protest and duress;"
that it could not be negotiated in its entirety without convey-
ing notice of said defense, and, if the check was taken as alleged
in the complaint, it was altered against the will of the defendant,
and it is not bound thereon; alleged further that the plaintiff
had knowledge of all the facts and circumstances attending
the making of the check and the defenses thereto before it
acquired same; alleged further a contract with the Ship Yard
& Dry Dock Company for the construction of a sand boat,
setting out the contract; that said company failed and refused
to comply with the terms of the contract, to its damage in the
sum of one thousand dollars, which it was bound to pay, ac-
cording to the terms of said contract; that it was required to
complete the boat according to specifications for another one
thousand dollars, and "defendant says that said check with
said statement attached was delivered to said company for and
in consideration of the completion of said contract; that said
contract was not complete, and that said check is without any
consideration and is wholly void."

The bank, appellee, received the check from the payee,
along with another check and a note of said drawer company
for the balance due the Ship Yard Company under the terms of

the contract, for the construction of the boat, discounted the note and credited the payee's account with the whole amount of the two checks, and the note less the discount. It forwarded the check on the 13th to the Bank of Commerce, at Little Rock, where same was presented to the drawee and payment refused, on account of payment having been stopped by the drawer, who telegraphed the drawee bank from Helena on the date of the issuance of the check, as follows: "J. R. Vinson, Southern Trust Company, Little Rock. My check on your bank, even date, amount $530.21, do not pay until I see you and explain. Mord Roberts."

The discount clerk in the appellee bank testified: "Am discount clerk for plaintiff bank, and have been in its employ for nine years. On July 13, 1910, our cashier was off on his vacation, and I was doing his work as well as my own. Late in the afternoon of that day C. L. Smith, the bookkeeper of the Helena Ship Yard & Dry Dock Company tendered me two checks drawn by the Southern Sand & Material Company, by Mord Roberts, President, one for $162.21, and the other for $530.21, and asked that they be credited to the account of the Helena Ship Yard & Dry Dock Company, which was done. These two checks were forwarded to Little Rock for collection through the Bank of Commerce on the same day. The one for $162.29 was paid, and the other returned. These two checks were taken by the plaintiff bank and the proceeds credited to the Ship Yard Company, and both checks became the property of the plaintiff bank in the due course of business and for valuable consideration, the Ship Yard Company having received credit for the amount called for in the check. Nothing has been paid on account of this check. Transfer was made on the afternoon of July 13, 1910. The whole transaction was with me, and I had no notice whatever of any defense or reason why the check would not be paid. If I had had, I would not have taken it. After the two checks mentioned above and the proceeds of the note for $1,773 had all been credited to the Ship Yard Company, the account was still overdrawn, and so remained.

"The check was taken and the amount credited without condition, and with no understanding or agreement that it should be charged back against the Ship Yard Company in

case it was not paid.   It was not taken for collection, but the proceeds were credited on the day taken, and there was no understanding that if it was not collected no credit would be given, or that the credit given would be cancelled.   The check was taken in absolute. discharge of so much of the debt of the Ship Yard Company as the proceeds would cover.   There was no condition about it.   The custom of the bank in regard to cashing checks varies with different people.   In this particular instance we had handled paper belonging to the Southern Sand & Material Company and to Mord Roberts, and we believed at the time of the purchase that the check was absolutely good, and we took it with that understanding.   There was nothing pinned to either the note or the check that the same was given under protest.   When payment was refused, we assumed that it was not convenient just at that time for Mr. Roberts to pay the same, so we held it until the 10th day of October when we returned it to the. Bank of Commerce at Little Rock, with instructions if not paid to deliver to J. W. House for collection or suit.   No special instruction was given until that mentioned."

C. L. Smith, the bookkeeper for the Dry Dock Company, testified that he had personal knowledge of the transaction for which the check was drawn; that it was delivered to him on the day it was drawn, that it was indorsed by the firm and taken to the plaintiff bank, and the proceeds credited to the Ship Yard Company; that he had no knowledge that the check would not be paid, and did not give the bank any information to that effect.   "Mr. Roberts, as president, had been giving the company checks prior to that time, and I assumed that this one, which was taken in the due course of business, was good."

John I. Moore, testified that he was a lawyer by profession, a stockholder and member of the board of directors of appellee bank, and employed by it when they required the services of an attorney.   That he knew nothing of the presentation of the check for payment until it was returned unpaid, and was referred to him in October, when he directed that it be returned to the bank's correspondent at Little Rock with instructions, if not paid, to deliver to J. W. House for suit; that it had not been

cancelled in October, and that so far as he knew it had not been yet; there was no memorandum attached to it in October, nor was there any memorandum attached to it when he saw it delivered to the representative of the Ship Yard Company on the 13th day of July; that he did not think any bank would accept a check with any such memorandum attached to it as was claimed to have been attached to this one; that he did not know that the bank or any of its officers had knowledge of any fact or circumstance that would have prevented the bank from accepting the draft in the usual course of business, but thought not; that he knew generally the contract between the appellant company and the Dry Dock Company, but not of its details; that Mr. Roberts was in his office on the 13th day of July, or the day prior thereto, in a bad frame of mind, about a matter of some painting and another small matter, which he claimed amounted to three or six dollars, which ought to have been done in order to complete his contract with the Ship Yard Company; that he and a member of the firm had a row over it, and Mr. Roberts came to see him to see what he could do about it; that he got Mr. Smith, the bookkeeper, to have the material put on the boat necessary to have the work done. Mr. Roberts agreed that he would have the work done and send the bill back for the costs, the work to be done *en route* to Little Rock. "That, as I understood it, settled up all the differences between Mr. Roberts and his company on the one part. And I assumed that when he made his explanations of his protest he was still treating the contract as having been fully complied with, but that the protest was made for the purpose of saving his rights if thereafter he found anything wrong with the job. I was not present when the check was delivered to the bank. I do not think that the bank had any agreement with reference to this check whatever."

Greenfield Quarles testified: "I am president of the People's Savings Bank & Trust Company, and was at the time of this transaction. The check was received on July 13, and the proceeds thereof credited to the Helena Ship Yard & Dry Dock Company, and the check forwarded that afternoon, together with another check for one hundred and sixty-odd dollars, to the Bank of Commerce at Little Rock, for collection. The check for one hundred and sixty-odd dollars was paid, and the

one for $530.21 was returned unpaid. Thinking it would be paid later, we kept this check until the 10th day of October, when we returned it to the Bank of Commerce for collection. The check never was canceled. No memorandum of any kind was attached to it. I would not have accepted it had there been, or had I any information as to there being anything wrong with it. Neither the bank nor any of its officers had any knowledge, actual or constructive, of any circumstance that could have prevented the purchase of the same by the bank, or the acceptance of the same in due course of business. At the time this check was accepted the cashier was away, and I had actual and exclusive charge of the affairs of the bank. Neither I nor the plaintiff or its officers knew any of the details of the contract between the defendant and the Ship Yard Company in regard to building a boat upon certain terms and conditions, nor did they know of any such contract at the time the bank received the check, nor did they have any knowledge or information that there was a dispute between the parties mentioned.

"A gentleman, stating his name was Mord Roberts, came into the bank some time during the progress of the work, and seemed very much concerned about the progress of the work, stating that it looked like the work would not be completed in time. It was a matter that I had no control over, and I listened to his complaint as I would to any one that would come in and talk with me.

"At the time the check was sent to the Bank of Commerce I regarded it as absolutely valid, as I do today, and knew of no defense that could or would be made to its payment, or any reason why it should not be paid. The Ship Yard Company was indebted to the bank. This check was tendered in due course in payment of a portion of their indebtedness. It was taken by the bank, and their account credited with the full amount in the due course of business."

"The bank accepted the check as absolute payment for the amount of the face of the check. I know of no custom on the subject of terms and agreements between the bank and depositors of checks on other banks outside of Helena. There was no agreement with the Ship Yard Company conditioned that, should the check be dishonored, the amount thereof should

be charged back against it. The check was accepted in absolute payment."

Mord Roberts testified that he was president of the Southern Sand & Material Company, owning a controlling interest in 1910; read its contract with the Ship Yard Company for the construction of the sand boat, also a bill of extras that was rendered about July 10, amounting to $692.50; that he left Helena with the boat on July 13, which should have been completed on April 20, and never was completed; that he was damaged by their failure to complete it as agreed by loss of business and the expense of an inspector for three months at $180 per month, and the salary of a captain two months at $150 a month. That the river was very low, and he had notice of a sufficient rise to bring the boat up. That the bill of extras was irregular, and was never applied to the boat, except the part, $162, which he paid. That, on account of the conditions at Little Rock, the contractors threatening suit for not delivering material, he went to Helena to bring up the boat. That the president of the Dry Dock Company was not there, and that after waiting two days he "called on Mr. Quarles, the president of the appellee bank, as that bank was the financial backer of the institution, and I believed that if I would explain to Mr. Quarles that he would take steps to get us out of there—take the men off the United States Steamer Quapaw and have them complete our boat, so we could move her." That he went to the bank, and met Mr. Quarles, who told him that he was not interested in the Dry Dock Company, but that he would 'phone for Judge Moore. That he came in shortly, and that Mr. Roberts related his troubles to them. He states they agreed that he had been badly treated, and Mr. Moore said he was their attorney, and that he would do anything about the matter that he could do. "I stated to Mr. Quarles the condition of the river, the condition of our company, the contractors threatening to sue us for damages for failure to deliver material, and I said to him: 'We are not looking for trouble. I am here looking for my boat.' I said, 'The Ship Yard Company has got $3,300 of our money, and the boat is not completed, and I can not get men enough on it to complete it, and we must leave here not later than the 14th of July; ought to get away on the 12th, for it will take us four days to get to

Little Rock.'" "Judge Moore said: 'All right, I will get down there, and I will see Mr. Smith, and see that it is done. I can't get Murnan.' Mr. Quarles said to me: 'They can't expect anything but trouble from you, Mr. Roberts.' I said to him: 'Well, I don't want any trouble while I am at Helena, because, if I have trouble, I want to get my boat at home and get her to work, and then I will fight out the trouble.'" He assured me on leaving that anything he could do to help me out of the unfortunate position I was in he would do. That was my first and last meeting with Mr. Quarles. That was on the 7th or 8th of July. It was four or five days after that before we left there. We had the boat towed out to the coal dock on the night of the 12th and coaled up, and on the morning of the 13th Mr. Murnan, the president of the Ship Yard Company, and I had some words. There were no stops for the rudders, and the boat was in the water. They should have been put on when she was in the dry dock, and I spoke to him about it. I probably said something rough and dropped her down the dock, and said to him: "I am going to leave town today." "He sent for Mr. Smith. The bill of extras was rendered the day I went to see Mr. Quarles. It was a surprise to me, and two days before I left there, Captain Brinkley, who was there as inspector for three months, and brought the boat around as master of it, and Mr. Smith worked two evenings over this bill of extras. All they could find above the contract as extras that I owed the company was $162. I wrote that check, and delivered it to Mr. Smith, who was the office man, and also wrote my note in compliance with the contract for the last payment. Mr. Smith went up there and Mr. Murnan told Mr. Smith to sue me. He said, 'Mr. Murnan said you couldn't leave here without a certified check for $530.21.' I said: 'You go tell Mr. Murnan that I won't give him a certified check for that amount.' That was the first time they ever asked me for a certified check. He said: 'Well, what will you do, Mr. Roberts?' I said: 'I will give you a check for it; anything on earth to get out of here.'" That he wrote the check which is in controversy, and also wrote the protest which was pinned to it, a copy of which is as follows:

" '(Ship Yard Company letter head.)
" 'Helena, Ark., July 13, 1910.

" 'Hon. John I. Moore,
" 'Attorney and Counsel for the Helena Ship Yard Co.
" 'Dear Sir:

" 'I have today written check No. 2, in favor of Helena Ship Yard & Dry Dock Co., amount ($530.21) five hundred and thirty dollars and twenty-one cents. This is to certify that I have written same under duress and % of statement from C. L. Smith, to the effect that unless I did so he did not think Mr. H. C. Murnan, Prest. of Helena Ship Yard, would let the boat go. I appeal from the gross and excessive charges contained in bill rendered by Helena Ship Yard Company for so-called extras. Captain M. S. Brinkley, who has been in charge of the work for past two (2) months, will testify that the charges referred to are excessive. Our business has been almost ru ned by the Helena Ship Yard Company's failure to complete their work on my boat within reasonable time, and they have me in their power. Hence I have submitted to this injustice with a view to only of getting boat released from their control. And this protest will serve as a notice to the Helena Ship Yard & Dry Dock Co., H. C. Murnan and Don G. Owens, as principals, that on my arrival at Little Rock I will file suit for damages against them.

" 'Yours very truly,
(Signed) " 'Mord Roberts.'

"When I pinned that to the check, I handed it to Mr Smith, and he carried it to Judge Moore's office. I accompanied him. Judge Moore read it, and he told Mr. Smith to accept the check; that this was a right Mr. Roberts had; that Mr. Roberts had been worse treated than any white man he ever knew that had come to Helena, and said: 'I am ashamed for Helena.' He said: 'Are you going to get away tonight, Mr. Roberts?' I said: 'Yes.' He said: 'Go, Smith, whether Murnan accepts that or not, I will see that Mr. Roberts gets possession of his boat.'

"The check was signed in order to get possession of the boat, and my personal note was signed the same day or the day before. I went to Mr. Moore, on account of his interest in the Dry Dock Company, to assist me in getting them to

carry out their contract.  If it had not have been with a view to getting possession of the boat, I would not have given the check.  The check was drawn on the 13th of July in the Ship Yard office.  C. L. Smith, the bookkeeper, was the only one present.  I went to the telegraph office at 8 o'clock that night, and wired here for them not to pay that check.  I executed that check in order to get possession of the boat, with a view of not paying it.  After I executed the check, the boat was released.  The protest was pinned to the check when I delivered it to Mr. Smith.  He was the bookkeeper of the Ship Yard Company, and their office man.  That was probably two blocks from the bank.  The protest expressed just what I intended them to understand at the time.  When I wrote it, it was my intention to file suit against them for damages for the delay and expense."

The court made the following declaration of law and instructed a verdict for the plaintiff:

"In this case, there is no testimony to show that the bank has notice of any defense in regard to the check.  It is true that Roberts had a conversation on the 7th day of July with the president of the bank, but that was not sufficient to put the bank upon notice that he had defenses to the check that was drawn on the 13th day of July.  The presumption is that, after the conversation on the 7th with the bank president and the check was drawn, it was in satisfaction of the debt, and not as a subterfuge to secure the possession of the boat.  No evidence being offered that the bank had notice that the check was drawn for that purpose, the court holds that the bank took said check without notice of any defense, and was a *bona fide* holder for value."

From the judgment thereon the defendant appealed.

*John W. Newman,* for appellant.

1.  The trial court erred in its declaration of law that the burden of proof was on appellant.  When appellant proved that the check was tainted in its inception with illegality and fraud, obtained from its maker by duress and fraud, and put into circulation fraudulently, the bank, even had it proved title, was presumed to have knowledge of the defenses, and the burden was on it to prove its innocence.  4 Am. & Eng. Enc. of L. 321, and authorities cited; 48 Ark. 454, 458.

2. If the notice was attached to the check when it was delivered, its removal was a material alteration which invalidated the check. Under the evidence it was therefore a question for the jury to determine whether or not the notice was pinned to the check. 3 Am. & Eng. Enc. of L. 228; 20 Mich. 425, 4 Am. Rep. 395; 13 Pick. 165; 23 Am. Dec. 674; 49 N. Y. 396, 10 Am. Rep. 382. The effect of a material alteration is to invalidate a check in any hands. 49 Ark. 40, 47.

3. Appellee is not a holder for value. The bank is presumed to have taken the check for collection only, and to have acquired no title. The title remained in the Ship Yard Company, and the bank can present no new defenses. 3 Am. & Eng. Enc. of L. 817; Morse, Banks, (3 ed.) § 586; 50 Fed. 467; 17 L. R. A. 291; 90 Ky. 431; 14 S. W. 411; 15 Fed. 675, 683; 51 Cal. 64, 21 Am. Rep. 697; 77 Ala. 168, 54 Am. Rep. 50; 32 N. J. Eq. 467; 35 Ill. 9; 85 Am. Dec. 336; 118 N. C. 548, 24 S. E. 365; 136 S. W. (Tex.) 551; 138 S. W. (Ark.) 473.

4. The undisputed facts show that the appellee had notice sufficient to put it on inquiry. Failing to make such inquiry, it is presumed to have known all that inquiry would have revealed. 21 Am. & Eng. Enc. of L. 590; 53 Fed. 875; 58 Ark. 84, 91; 94 Ark. 426, 428; 77 Ark. 172; 86 Ark. 191, 201.

*J. W. House* and *J. W. House, Jr.,* for appellee.

1. The true rule in cases of this nature is this: "When fraud is set up as a defense and the holder responds by showing that he acquired the instrument *bona fide* for value in the usual course of business, while it was current, and under circumstances which do not operate as constructive notice of the facts which impeach the original validity, *the defendant must then prove that he has actual notice of such facts;* otherwise, the holder's right to recover against him is perfected." 1 Daniel, Neg. Inst. par. 819; 78 Ala. 71; 11 Mo. App. 498; 84 Pa. St. 446; 72 Mo. 282; 72 Ind. 133; 12 O. St. 541; 48 Ark. 458. The uncontradicted evidence shows that the check was given in payment of a preexisting debt to the appellee, which is a valid consideration in this State. 48 Ark. 459; 88 Ark. 97; 94 Ark. 387; 65 Ark. 210. The above-quoted rule was fully met by appellee in this, that it proved that the bank

officials who handled the check had no notice, either actual or constructive; that the check was taken in the usual course of business while it was current, and under circumstances which do not operate as constructive notice of the facts which impeach the original validity of the check.

2. The so-called protest in its face was not a part of the note nor intended as such; it was directed to the attorney for the Shipyard Company, and was taken and delivered to him by an agent of the Shipyard Company, accompanied by the party who drew the check, to see if it would be accepted. The only effect of the protest was to give notice that appellant would institute suit when its president reached Little Rock. But, if it be admitted that the protest was pinned to the check when delivered to the bookkeeper of the Shipyard Company, and when negotiated it was detached, and not shown, this would not have bound appellee, because, when a memorandum is attached to a check and subsequently removed and the check is passed to a *bona fide* purchaser for value without notice, the drawer has no defense. 2 Daniel, Neg. Inst. par. 1407, 31 Am. Rep. 131, 134; 58 Ind. 428; 75 Pa. St. 188; 17 P. F. Smith, 59; *Id.* 82; 46 Pac. 221; 54 Ill. 213.

3. Appellee is a holder for value. The facts shown in evidence are that the Shipyard Company was indebted to the bank, which was pressing for payment, and that at the same time the check in question was delivered to appellee a note for $1,672, and a check for $162, payable to the same payee and drawn by the same drawer, were also given to appellee with directions to credit it to the account of the Shipyard Company. That this was done. The effect thereof was to discharge the Shipyard Company's indebtedness to that extent. The bank had a perfect right against both the drawer and the indorser, and became a *bona fide* purchaser for value without notice. It was a cash entry, and not an entry for collection. 3 Am. & Eng. Enc. of L. (2 ed.) 817, note under paragraph, "Taken for Collection and Credit." 50 Fed. 647; 14 S. W. 411; 23 N. Y. 289, 290, 291, 292; Morse on Banks & Banking, (3 ed.) Par. 582, 583, 578; *Id.* par. 573; 3 L. R. A. (N. S.) 1173-4; 16 Am. St. Rep. 344-5; 46 N. J. L. 604; Morse on Banks & Banking, §§ 569, 570; 1 Rose, 153; 79 Mo. 421; 49 Am. Rep. 235; Story on Agency, § 228, note; 100

U. S. 689; 90 N. Y. 530, 534; 3 Keys, 137; 4 Dall. 234; 68 Ala. 267; 45 N. Y. 735; 46 N. J. L. 604; 100 U. S. 686; 50 N. W. 124; 59 N. Y. 987; 26 S. W. 975-6; 120 N. W. 182; 106 N. W. 942; 57 S. E. 869; 67 Mo. App. 97.

4. The rule of law stated by appellant in support of its contention that appellee had notice of all defenses, while sound, has no application to the facts in this case. The testimony shows that appellant had not paid the last payment on the boat, nor for the extras, and the conversation had with the bank officials, which appellant claims was notice to them occurred several days before the check in controversy was given; and when it was given, another check, drawn by the same parties to the same payee and on the same drawer, was given, which was cashed. The fact that one of the checks was cashed with appellant's consent is proof that appellee was justified in its dealings, and had no notice sufficient to put it on inquiry. 1 Daniel, Neg. Inst. par. 796; 52 Mo. 533; 69 U. S. 100; 62 Ill. App. 371; 13 Am. Rep. 583; 18 Am. Rep. 435; 30 S. W. 1077; 13 Pac. 723; 42 Conn. 146; 4 Ga. 287; 88 U. S. 354; 66 Fed. 263-264; 4 Am. Rep. 209; 1 Pac. 789; 28 Am. Rep. 59; 47 Md. 88; 111 Mass. 342; 34 N. J. L. 187.

KIRBY, J., (after stating the facts.) The evidence on the part of the appellant is not sufficient to show that the check was tainted in its inception with illegality or fraud, or obtained from the maker by duress. Its president stated that the account for the claim was submitted to him and examined by himself and his inspector for some days before the check was finally given. That, while he regarded it an injustice, he gave the check for the amount claimed to be due by the Dry Dock Company, on completion of the vessel, in order to have same released and turned over to him, saying: "I wrote that check and delivered it to Mr. Smith, who was the office man, and also wrote my note in compliance with the contract for the last payment. Mr. Smith went up there, and Murnan told Smith to sue me. He said: 'Mr. Murnan said you couldn't leave here without a certified check for $530.21.' I said: 'You go tell Mr. Murnan that I won't give him a certified check for that amount.' That was the first time they ever asked me for a certified check. He said: 'Well, what will you do, Mr. Roberts?' I said: 'I will give you a check for it—anything on earth to get out of here.' "

In his protest and notice to the attorney for said Ship Yard Company, he stated that he had written the check under duress on account of the statement of the bookkeeper that "unless I did he did not think Mr. Murnan would let the boat go.  *  *  *  Hence I submitted to this injustice with a view to getting the boat released from their control. And this protest will serve as a notice to the Helena Ship Yard & Dry Dock Company, H. C. Murnan and Don G. Owens, as principals, that on my arrival at Little Rock I will file suit for damages against them."

He gave no intimation to any of the parties in interest that he intended to stop payment of the check, or that it would not be paid in the usual course of business upon presentation, and his protest, which was directed to the attorney for the Ship Yard Company, was only intended as a notice that he did not propose to be bound by the giving of said check to release any claim he might otherwise have for damages against said company because of its failure to comply with the contract. In other words, the check in payment for the claim was given with a full understanding of all the circumstances, and the boat was turned over to appellant upon its delivery, and we see no reason why the maker of it should not be estopped to deny its validity. *Springfield & Memphis. Rd. Co.* v. *Allen,* 46 Ark. 220.

If, however, it be conceded that the transaction was so tainted with duress that it would have been available to appellant as a defense, had the suit been brought by the payee of the check, we still are of the opinion that appellant can not avail himself of such a defense herein.

The undisputed testimony shows that the plaintiff had no notice of any such defense between the original parties to the check nor of any facts that should have put it upon inquiry.

The conversation of Mr. Roberts of the appellant company with the president of the bank and the attorney of the Ship Yard Company occurred four or five days before the final settlement with the Ship Yard Company and the giving of the check sued upon, and related chiefly to the failure of said company to complete the boat on time, and his complaint that it was not then making the proper effort to complete it, and that it should take men off another boat and finish appellant's,

so he could remove it on the approaching rise of the river. Mr. Quarles, at this time, told him he had no interest whatever in the Ship Yard Company, and called in Judge Moore, who was its attorney, and who, as Mr. Roberts says, agreed to go down and see if he could not have the boat completed. Nothing was said about any claim of the Ship Yard Company for extras, nor was there any suggestion of the injustice of such a claim, and such conversation could not have put the bank on notice that a check thereafter given in all respects apparently valid was made under duress and affected by the terms of a written protest said to have been pinned to it. The reasonable and fair inference would have been that the matters in controversy between the appellant and the Ship Yard Company had been adjusted satisfactorily and finally settled by the giving of the note and the checks.

All the officials of the bank, who had anything to do with the transaction, testified that the bank had no notice whatever of any defect or irregularity about the check or its terms, or that it was other than it appeared to be, and that it was taken in the usual course of business, and the whole amount of it credited to the account of the payee. It is true, some of the witnesses on this point stated that "the proceeds" were credited to the payee's account; but from their statements it is evident that they used such expressions as synonymous with "the amount" of the check. The check was presented to the bank in the usual course of business on the day of its date, without any notice on its face of any invalidity or defense, accepted by the bank and credited to the payee on its books.

In *Burton* v. *United States*, 196 U. S. 303, the court said: "When a check is taken to a bank, and the bank receives it and places the amount to the credit of the customer, the relation of creditor and debtor between them subsists, and it is not that of principal and agent."

And also quoting from *Craige* v. *Hadley*, 99 N. Y. 131, 52 Am. Rep. 9, 1 N. E. 537: "The general doctrine that, upon a deposit made by a customer in a bank, in the ordinary course of business, of money, or of drafts or checks received and credited as money, the title to the money, or to the drafts or checks, is immediately vested in, and becomes the property of, the bank, is not open to question." * * * The transac-

tion, in legal effect, is a transfer of the money, or drafts, or checks, as the case may be, by the customer to the bank, upon an implied contract upon the part of the latter to repay the amount of the deposit upon the checks of the depositor. The bank acquires title to the money, drafts, or checks, on an implied agreement to pay an equivalent consideration when called upon by the depositor in the usual course of business."

It is true that the account of the payee of the check, the Ship Yard Company, was overdrawn in a large amount when this check was presented by it, and the amount thereof credited upon its account; but it has been held by our court that one who takes negotiable paper in payment of an antecedent debt before maturity and without notice of any defect receives it in the due course of business, and becomes, within the meaning of the commercial law, a holder for value, entitled to enforce payment without regard to the defense that may exist between the other parties to the paper; and this is in accord with the very general concurrence of judicial authority. *Tabor v. Merchants' National Bank*, 48 Ark. 458; *Evans v. Speer Hdw. Co.*, 65 Ark. 210.

The undisputed testimony in this case shows that the appellee bank in effect cashed the check sued upon in the usual course of business upon the date it was drawn, without any notice of any infirmity in it or any defense that might be available between the parties to it, crediting the whole amount of it to the payee upon its account, and it thereby became a *bona fide* holder of the same for value, with the right to enforce it against the maker, free from any defense that may have existed between the original parties.

It is also contended by appellant that there was such an alteration of the check after it was made and delivered to the payee as should release it from payment. The undisputed testimony shows, however, that the check as sued upon was the same as made without any alterations or changes thereof, and that the bank had no notice at the time it was presented and credited to the account of the payee of the letter of protest, addressed to the attorney of the payee company, that had been pinned to the check at the time of delivery thereof to the payee, according to the statement of Mr. Roberts, the president of the appellant company.

This letter of protest was written upon a separate paper,

without any memorandum on the face of the check, indicating that it was affected by any conditions not shown thereon, and only pinned to the check and easily detachable therefrom without leaving any evidence of any change in the terms of the check and, being detached therefrom at the time it was cashed without notice to the appellee bank, its rights were in no way affected by it being so severed and destroyed.

In Daniel on Negotiable Instruments, § 1407, it was said:

"But if the memorandum were so written upon the margin or any other part of the instrument that it could be readily separated from it, without giving it a mutilated appearance, a *bona fide* holder taking it without notice we should consider unaffected by its being so severed and destroyed. This view was well illustrated in a late Indiana case. *If the memorandum were originally made upon a separate paper, there can be no doubt that, although a contract binding between the parties, it would be of no effect against a third party without notice, if the party who executes a negotiable instrument chooses to restrict its effect by a separate memorandum, instead of writing the entire contract in the body of the instrument, he should not be protected against a fraud of which he has laid the foundation.*

"The holder should be protected, upon the principle that where one or two innocent persons must suffer, the loss should fall on the one who furnished the opportunity. The case is analogous to those in which blanks have been filled with excessive amounts. The promisor should be held bound when he has left his contract in a form to be mutilated by the cutting away of a part, as well as where he has left room for an alteration to be engrafted upon it."

In this case the undisputed testimony shows that the appellee was the *bona fide* holder of the check for value without notice.

It was entitled to recover thereon, and the court correctly directed the jury to return a verdict, there being no disputed question of fact to be determined by them.

The judgment is affirmed.